[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal by Earl E. Welch and Larry D. Welch from the assessment of damages in the amount of $71,800 paid by the defendant for the partial taking by eminent domain on January 25, 1990, of their property situated on the easterly side of Hillside Street, in the Town of East Hartford, pursuant to the provisions of General Statutes Sections 13a-73(b) and (e) and 13b-23,[1] for the layout, alteration, extension, widening, change of grade and improvement of the highway commonly known as Hillside Street.
Said premises are more particularly described and bounded as follows: Northerly by land n/o/f/o Thomas F. Henahan et al., 19 feet, more or less; Easterly by the "Taking Line" as shown on the map hereinafter referred to, 99 feet, more or less; Southerly by land n/o/f/o Coachlight Condominium, 14 feet, more or less; and Westerly by Hillside Street, 100 feet.
Said parcel contains 0.039 of an acre, more or less, together with all buildings and appurtenances thereon, all of which more particularly appears on a map entitled: "Town of East Hartford, Map Showing Land Acquired From Earl E. Welch et al by The State of Connecticut, Reconstruction of Hillside Street, Scale 1" = 40', July 1987, Robert W. Gubala, Transportation Chief Engineer — Bureau of Highways."
Said premises were taken together with the following rights on portions of the owners' remaining land:
1. A right to grade and remove, use or retain excavated material within an area of 0.018 of an acre, more or less, and located between and opposite approximate Stations 39+38 and 40+36 right, Base Line Present Hillside CT Page 3931 Street, as more particularly shown on said map;
2. A right to install sedimentation control system within a distance of 93 linear feet, more or less, and located between and opposite approximate Stations 39+38 and 40+36 right, said Base Line, as more particularly shown on said map; and
3. A right to remove building within an area of 0.015 of an acre, more or less, and located between and opposite approximate Stations 40+00 and 40+25 right, said Base Line, as more particularly shown on said map.
The above three rights shall terminate automatically upon completion of the work by the State.
Prior to the taking the subject property consisted of a parcel of land containing about 18,485 square feet, or approximately 0.424 of an acre, and improved with a one and one-half story frame residential/commercial structure, which was built in 1900. The building was nonconforming as to the required 25 feet front yard setback, and its commercial use of the basement was authorized by a variance of long-standing. Because this building straddled the taking line, it was necessary for the defendant to obtain the right to demolish the structure.
The first floor apartment, having an area of 816 square feet, consisted of a kitchen, living room, two bedrooms and bath, and rented for a monthly rental of $400. The second floor apartment, having only 486 square feet, consisted of the same rooms and carried the same rent. A portion of the basement, with a two-fixture bathroom and having a walkout door, was rented to a relative for the storage of materials at a monthly payment of $100. The septic sanitary sewage disposal system was destroyed with the defendant's removal of the building after the taking. The assessment of the building on the tax list of October 1, 1989, at 70% of fair market value, was $13,340, based on a revaluation in 1981.
The site is rectangular in shape with a frontage of 100 feet on Hillside Street and an average depth of 195 feet. The northerly portion, in excess of 50% of the area, is zoned Business 1. The remainder is zoned Residence 4. The grade slopes steeply downward from the street to the rear property line. There is a gravel driveway on the south side and a small unpaved parking area in the rear of the building. A very small portion of the southeast corner of the lot, to elevation 22 feet, is in an inland wetlands regulated area. A larger area in that quadrant, to elevation 30 feet, is in the 100 year flood zone. Since the taking the Inland Wetlands Environment Commission of East Hartford adopted a 100 feet wetlands setback line. As applied here, it stretches across the land about midway in an arc CT Page 3932 clockwise from south to north.
The properties adjoining on the north front on Burnside Avenue in a Business 1 zone and have been developed commercially. Other properties a short distance from the rear of the subject site, also located on Burnside Avenue, as well as the property on Hillside Street adjoining on the south, have been developed with condominiums. All utilities are available to the site except public sewers.
After the defendant's taking and removal of the dwelling, the remaining land consists of an unimproved site containing about 16,785 square feet, or approximately 0.385 of an acre, and having a reduced street frontage of about 99 feet. The grade at the front of the property has been raised. Additionally, any new building erected on the site would now have to meet the required 25 feet setback. This is significant because the extra setback in any development of the property would be in addition to the average depth of 16.5 feet of front yard taken in this proceeding.
The land's greater value at taking came from its future potential development, and not from the continuance of its former residential use dating back to 1900. A decrease in length averaging 16.5 feet as well as in width by one foot of the habitable land upgrade and beyond the reach of the wetlands setback and flood plain border on such a relatively small parcel would tend to reduce the value of the remaining land.
Since the site is less than 200 feet from the public sewer main on Burnside Avenue, any development thereon would now have to be connected to it. The plaintiffs could no longer rely upon a septic sewer system. Except for the initial cost required, that would be a benefit to them. Even without the taking, any future development of the property would be obliged to meet this requirement. The cost estimate given to the plaintiffs for providing a sewer service line 195 feet in length was $34,360.
The plaintiffs offered expert testimony on the estimate for erecting a residential/commercial structure having a gross area of 1675 square feet with parking for seven vehicles on the remaining land. With the above estimate for a sewer installation, this cost was claimed to be $111,648. Various governmental permits would be required, and it is reasonably probable that under the existing surrounding circumstances these are obtainable. This claim of damages, however, is unrelated to the defendant's taking. The cost of any improvement to the property is not compensable in this proceeding. The improvement of their property after the taking is not a consequence of the condemnation here. After the taking, the improvement of the property would be to their benefit, and at their cost. They are entitled only to fair and just compensation for the property and rights taken. There CT Page 3933 are no severance damages due to the defendant's taking.
The plaintiffs' appraiser, as did the appraisers for the defendant, considered the sales comparison approach the most appropriate method for determining the fair market value of the subject property before and after the taking. In his evaluation before the taking, the plaintiff's expert found its utilization as income producing property to constitute its highest and best use. Two residential/commercial/office properties on Burnside Avenue and one on Tolland Street nearby to the north were utilized. After making his adjustments to these sales, he concluded the before taking value of the subject property to be $225,000.
In his opinion the highest and best use of the subject property after the taking is for development with a small commercial building. In estimating the after taking market value, therefore, he utilized comparable sales of unimproved land. In order to be so developed, however, zoning approval would be required as well as a connection to the Burnside Avenue sewer. Other governmental permits required because of wetlands and flood plain regulations were not considered by him.
The appraiser's report was based upon two recent sales of unimproved land in East Hartford, one smaller and the other larger than the subject site, but both being under one acre in size, which sold for $8.24 and $11.99 per square foot, respectively. An adjustment grid submitted in evidence at trial reduced these prices, upon which he predicated his valuation, to $6.18 and $6.00 per square foot. In his earlier prepared report, however, he had estimated the after taking value of the subject land at $7.00 per square foot, less a 20% reduction for the zone change necessary for commercial development, or a net value of $5.60 per square foot. The supplemental adjustment grid showed a -20% adjustment for zoning status on both comparables.
His after taking valuation of $58,996, rounded to $59,000, was derived as follows: $93,996 for 16,785 square feet @ $5.60 per square foot, less $35,000 cost of a sewer hookup. The supplemental adjustment grid showed a -10% adjustment for the absence of a sewer on the comparable prices.
The plaintiffs' taking damages, therefore, were estimated as follows: value before taking — $225,000; less value after taking — $59,000; resulting damages — $166,000; plus compensation for temporary rights — $1500; total damages — $167,500.
The defendant utilized three appraisal reports compiled by two experts. The first report valued the plaintiffs' property as of July 14, 1989. This report, prepared by Verne E. Fuerst, then employed by the Department of CT Page 3934 Transportation, estimated the taking damages at $71,800, the amount thereafter paid to the plaintiffs.
The highest and best use of the appraised property was, in his opinion, its development to professional/commercial use, as presently improved, if the site were vacant. Its use at the taking, while yielding a fair return, was viewed as an interim use. Conversion to an office and/or professional type business building would probably be a maximally productive type of use.
Fuerst considered in depth all three valuation techniques. By the sales comparison approach, he estimated the before taking value of the property to be $211,200; by the income capitalization approach it was $195,400; and by the cost approach $194,300. The sales comparison method was considered the most reliable and appropriate analysis of value.
In determining the after value of the remaining land, the appraiser utilized the same comparable land sales considered in the before valuation as part of the cost approach. With adjustments, these ranged from $8.02 to $8.32 per square foot. From these values he estimated that $8.25 per square foot represented a fair and reasonable market value of the subject property, for a total valuation of $139,367, rounded to $139,400. In his opinion, neither the taking nor the rights acquired adversely affected the unit value of the land or its total valuation.
The appraiser's summary damage calculation was as follows: value before taking — $211,200; less value after taking — $139,400; resulting damages — $71,800. By reconciliation: loss of land (1,699 square feet @ $8.25 per square foot) — $14,017; plus loss of improvements (dwelling net of depreciation) — $57,816; damages — $71,833, rounded to $71,800.
The defendant's second appraisal was made by Donald P. Mullane as of July 21, 1989. Although he did not testify at the hearing, his report, like the earlier report, was placed in evidence by the plaintiffs. At that time he found the fair market value before the taking to be $217,000, after the taking to be $134,500, and the damages to be $82,500. In his opinion, the highest and best use of the property has a commercial use, specifically office use.
In his analysis of value, he found ample quality and quantity of data to process all three approaches to value. The indicated range of value was from a low of $194,900 (cost approach) to a high of $220,000 (comparable sales approach) with the value estimated by the income approach falling in between, at $217,000. Since the property's highest and best use was an office conversion, he concluded that the most reliable indication of value was the income approach, or $217,000, as of July 21, 1989. CT Page 3935
In his opinion, the highest and best use of the property after the taking will be improvement with an office building in accordance with zoning. In his after valuation, he used the same land cost as in his analysis of the before taking estimate, namely, $7.90 per square foot, for a total after value of $134,520, rounded to $134,500. The taking of the fee and the rights acquired were determined to have no impact upon the land's unit value.
The final appraisal report for the defendant was made by his first appraiser, Verne E. Fuerst, but as of January 25, 1990, the date of taking. This was introduced in evidence by the defendant and supported by the expert's testimony. On this occasion he found the fair market value before the taking to be $184,000, after the taking to be $143,600, and the damages to be $40,400.
He reaffirmed his earlier opinion that at the taking the highest and best use of the subject was its interim use with prospects for future conversion and development a good possibility. His earlier appraisal that if the site were vacant its highest and best use would be development to professional/commercial use, as presently improved, however, was now qualified by the economic downturn which he calculated began in midyear 1989. At this time, he opined, prospects for near-term development of the subject property to its highest and best use is unsupported by market evidence and, therefore, financially infeasible.
As in his previous report, he considered the comparable sales technique the most reliable and appropriate analysis of value, but this time he used less appropriate comparables. Previously he compared four sales of properties utilized for (1) commercial rental, (2) office space, (3) commercial/business/residential uses, and (4) office/residential uses. His three new comparables were each used for two apartments. Based on these adjusted sales, he now found the before taking value as of the date of taking to be $183,989, rounded to $184,000.
In determining the after value of the remaining land, the appraiser, as he did in his earlier appraisal, once again utilized the same comparable land sales considered in the before valuation as part of the cost approach. With adjustments, these now ranged from $8.48 to $8.55 per square foot. From these values he estimated that on January 25, 1990, $8.50 per square foot represented a fair and reasonable market value of the subject property, for a total valuation of $143,591, rounded to $143,600. Again he reiterated his opinion that neither the taking nor the rights acquired adversely affected the unit value of the land or its total valuation. Considerable probative questions arise concerning these conclusions of the defendant's appraiser. CT Page 3936
In his July 14, 1989 appraisal, Fuerst utilized four comparable sales. Two of them, 320 Silver Lane and 361 Main Street, East Hartford, were the same properties as two of the three sales compared on the January 25, 1990, appraisal. In the first appraisal, 320 Silver Lane was a sale listing for $450,000, or $9.49 per square foot, which was adjusted on the comparison grid to $8.07 per square foot. Notwithstanding his devaluation of the subject property because of the economic downturn which he found began in midyear 1989, in the later appraisal 320 Silver Lane was listed on January 23, 1990, two days before the taking, for $163,000, or $10.02 per square foot, which was adjusted to $8.52 per square foot.
No. 361 Main Street sold on May 5, 1989, for $230,000, or $13.89 per square foot. On the July 14, 1989, appraisal, this was adjusted on the comparison grid to $8.32 per square foot, and on the date of taking to $8.48. This comparable sale also does not support the appraiser's devaluation of the subject site and its comparables.
The court finds that the highest and best use after the taking is the development of the front portion of the subject site for professional office or business/commercial use with surface parking in the unregulated rear yard and even in the flood plain with permission, which probably would reasonably be granted.
It disagrees, however, with the defendant's conclusion that neither the taking nor the rights acquired adversely affect the unit value or total valuation of the subject property. The reduced frontage of 100 feet to about 99 feet is an important loss in valuation, especially when this reduction is multiplied for an average depth of 16.5 feet of the street grade front and best buildable portion of a lot that slopes into a flood plain and swampland of decidedly less value. Just as 100 points or one carat is a standard measure of a gemstone, so too is a width of 100 feet of land a common measure of street frontage for the sale of property and zoning requirements, although 75 feet frontage is sufficient for Business 1 and Residence 4 zones. Additional to the loss of an average 16.5 feet of frontage is the pushback of a 25 feet setback line, especially on a parcel of land with restricted building space because of rear wetlands and flood plain.
Finally, the three rights that terminate automatically upon the completion of the highway construction are not without value. While they are described as temporary, their results are permanent and may not be interfered with by the property owners. Their reach extends beyond the taking line forever. CT Page 3937
It is the charge of this court to make an independent determination of value and fair compensation for the property taken in the light of all circumstances, the evidence, the opinions of the expert witnesses, his knowledge of the elements that establish value, and a viewing of the premises and surrounding area. Minicucci v. Commissioner of Transportation,211 Conn. 383, 388 (1989). In performance of this duty, I find that the before taking value of the subject property was $220,000, and that the after taking value is $117,495, rounded to $117,500. Damages, therefore, are assessed at $102,500.
Judgment may enter for the plaintiffs in the amount of $102,500, less $71,800 already paid, or an excess of $30,700, with interest on such excess at 10% per annum from the date of taking to the date of payment, together with costs, and a reasonable appraisal fee of $2000.
William C. Bieluch State Trial Referee